The next case is American Civil Liberties Union of Connecticut v. Byars. Mr. Barrett, you have reserved three minutes for rebuttal, so that gives you seven minutes to begin. Good morning to the Court. This First Amendment court records access dispute arrives after a trial in the District of Connecticut in which the parties eagerly showed in open court five unique videos, one being a duplicate, so six in total, to the jury and relied on them in their closing arguments. No one raised a peep about sealing until... I'm hoping you can clarify your position on waiver. Is your position that if a party introduces a document at trial without sealing it, the court is later obligated to release that document without any possible limitation? There's two ways to look at the waiver issue, Your Honor. The first, I think you're suggesting a sort of procedural view of it as courts treat any other litigation matter. I'm not really suggesting anything. I'm trying to understand your perspective. Thank you. So then there are two ways of looking at it. I mean, really, the first to me is substantive. Press Enterprise 2 requires that a party looking to seal demonstrate that sealing is essential to achieve a higher value. A party that knows or, in fact, plans on introducing evidence at trial, it can't be heard months later to say, well, in actuality, it's essential that the... In the courtroom, there might be nobody in the courtroom. I've tried cases in which there's nobody there except the interested parties. And so there's no real need to worry about this being repeated or broadcast outside. Well, because a Second Circuit practitioner would know that New York Times, in re New York Times, from this court from 1987, did away with the difference between attendance and access to records. You were ultimately allowed to review the documents, the videos, the same way that the jurors or others in the courtroom would have. But you wanted to do more than that. And so why wouldn't it have been reasonable for the litigants to just figure, well, if somebody's going to make a much broader request to broadcast these things, then we'll be heard. But unless and until then, we're not going to worry about it too much. Well, that's the heart of it, Your Honor. A represented party makes their decisions about what's important and what's not. And when a party decides that information is not so important that it even will bother sealing or closing the courtroom, that goes to the heart... That has to be a waiver for all purposes, for all time. No. I think there could be intervening factual developments that may make a party revisit a decision to show information in open court. I'm thinking off the top of my head, perhaps the United States at a criminal trial enters evidence without thinking much about any ongoing enterprise or conspiracy. It later determines that, in fact, what it showed in open court could be damaging to a completely unrelated investigation due to later developments. That could happen. So, I mean, I think there are two things I'm having trouble with. The first is that it seems to me that you're suggesting that a qualified right, which I think you would agree that the First Amendment is, becomes an unqualified right depending on what a defendant in a case or a party in a case does. How can that doctrinally be true? Well, not quite, Your Honor. Well, and then the other part I want you to think about is you said about an ongoing case, what about a third person? Like, we, I mean, we have, we certainly have precedent that suggests that if there's a third person that is injured or affected, that changes the calculus here. But first, let's go back to the doctrinal matter. How can a party change a qualified right to an unqualified right? By severe, so diminishing its compelling need, its asserted compelling need in sealing as to make the analysis a new paradigm. Okay, but that's different, right? That's different to say that that is one of the factors that gets squished in when people are trying to assess what the nature of the limitations are. And I think that is a different issue, saying that there's a big thumb on the scale then for access or disclosure because they thought it was fine to issue it without sealing is different than they waived the ability to say that it needs to go through the First Amendment analysis. I think that if you look at this species of argument as going to the first element of press enterprise, too, the compelling need, another way to phrase it is that the party that eagerly demonstrates, that eagerly shows the items in the courtroom and sits on its hands when its opponent does the same simply can't make that. What's the difference between eager and not eager? We don't usually get into the motivations for introducing evidence, but we should be assessing whether they were eager, how quickly they did it, whether they said it with a certain amount of glee. No, Your Honor. I mean. Let's just cut out the adjectives or adverbs and just sort of focus on what you're saying. It seems to me you're asserting that by introducing an exhibit, they have lost it forever. No, I think it's more accurate to say that any months later claim that in fact it's crucial to seal the exhibit has very little or no weight and can't, as a matter, absent an intervening factual development or, as Judge Perez points out, a third party stranger coming to court, that they're just, the first prong can't be met. But that's not waiver though, right? Can we get, so then are you now saying that that's not waiver, right? By saying that that is a giant good fact for you later when one is doing the First Amendment analysis is a different doctrinal matter than saying, than asking us to say, as a matter of law, when someone does not object to sealing of a document, they can never come back and say, or they've waived it, their ability to come back and say that it needs to be limited. Yes, Judge Perez, that's right on the substance. If I may, let's go back to Nixon v. Warner Communications. And that was a case where the tapes were introduced at trial without any sealing, correct? That's right. And the court went through it under the common law access privilege, which you're not asserting in this court, correct? And then it went on to analyze it under the First Amendment in Nixon. And what the court said is the issue is not whether the press must be permitted access to public information to which the public generally is guaranteed, but whether these copies of the White House tapes to which the public has never had physical access must be made available for copying. And the court says quite clearly, but the line is drawn at the courthouse door and within a reporter's constitutional rights are no greater than those of any other member of the public. Now, I think you're raising rights as a member of the public. Consistent with Nixon v. Warner, where does that entitle you to copies of the tapes after trial? They were not sealed. The Warner came back after the trial and said, we want these copies. And the court said you had the right to report on everything that went on in the courtroom, but you don't get copies of tapes. And the answer lies in this court's subsequent development in 1980 in Ray NBC and in 1987 in Ray New York Times. Can that contradict a holding in the Supreme Court? Well, it's not so much a line. Yes, Your Honor, I would say it's a development. Nixon v. Warner, I think, is best understood in the First Amendment to take — it's not a very in-depth analysis of the First Amendment right. And this circuit has since 1980 and 1987, respectively, under both the common law and the First Amendment rights, done away with the physical presence distinction to say that, well, if you're — just because you were able to be there, that suffices for the First Amendment. That's no longer true. But in doing that, they've said, for example, if it's a pretrial hearing or a pretrial motion where there may not even be a hearing, you can get the documents, the written submissions, because there may never be an opportunity for you to sit in a courtroom and see something. This, however, was a trial, just like in the Nixon case. You could have come, listened, take notes, published anything. And nonetheless, the controlling law of this circuit is that one need not have attended in order to obtain judicial documents. There's no dispute here that these trial exhibits are judicial documents. And as a result, think of Lugosch, the right attaches to them. So as the Third Circuit put it, what good is the right if one cannot fit through the courthouse door? Well, I don't think we need — I mean, do we need to go to the Third Circuit? I mean, by my view, there are different ways courts are interpreting our obligation in Nixon and Warner. We have, like, the First, the Fifth, and the Sixth, which suggest that that doesn't afford rights to copies or transcripts. But we do have the Fourth. And then we've got two cases that suggest that it includes the right to make copies of records. So can you tell me in a way that may answer Judge Costell's question about Hartford — what do we do about Hartford, Curran, and Erie? How do they fit into the distinction that he is drawing and the lessons that were supposed — that were guided by in Nixon and Warner? Well, I think that Hartford, Curran v. Pellegrino, and then their INREG NVC, which was a common-law case, Pellegrino was a First Amendment case, those decisions from this Court both conflate inspection and copying. And I think that's the right answer for the reasons that we've discussed. It's not possible. Once the access right is no longer predicated on physical presence, then duplication of the items is what's needed. In Hartford, Curran v. Pellegrino, it effectively developed the common-law right, which this Court viewed as encompassing both inspection and duplication. And it imported it into the First Amendment context, which this Court has on many occasions said is stronger than the common-law right. So as a matter of common sense, it makes sense, particularly in those cases for which the media was the petitioner, to permit copies rather than inspection. They are the same thing. The public is able to come and view the document or take a copy. It really doesn't particularly matter to the First Amendment access right. Can you answer whether the order that the district court entered, which allowed you limited review, did that prohibit you from speaking about what was seen on the tape? Were you entitled to write a piece in the New York Times reporting on what you saw? Yes, Your Honor. Going all the way back to Bellotti and all the way through, I'm thinking, you know, Randall v. Sorrell. On its face, did the order restrict you in purport to gag you? No, I wouldn't call it a gag order, but it was a limitation on if you're asking if there's a First Amendment injury here. The answer is yes. It's a bar against speech formulation. Well, that's what I'm trying to find out. Just help me with what happened in the record. What did the order restrict you from doing when you were viewing the tape that had been played at trial? From a couple of things that jumped to mind identified in our motion to intervene. The first is repackaging and redistributing the material. My client is the ACLU of Connecticut. We have a public education and public policy advocacy operation. Could you write about what you saw in this so-called restrictive viewing? We could write about it. We couldn't do two things. Number one, redistribute, and number two, sit down with our elected representatives who we are trying to convince to exercise more oversight over the Connecticut prison system and watch the video with them at present. The only way we can – I understand that. Well, did you seek at any time to have anyone come with you to the viewing? No, Your Honor, because we took an appeal. All right. So you never did view the videos then? I did, Your Honor, yes. In what connection? You first saw them. You took advantage of what the district court ordered and took your appeal, which is appropriate, but that's what you did. That's right. And if we are – if at the end of the day we're left with a prohibition against copying, then we will bring – we will have to bring elected representatives or other opinion and policymakers to defense counsel's office to watch them in the presence of defense counsel. Those are somewhat serious speech restrictions. Well, you can ask for a modification of the order that anyone who wants to view the video can view it. Well, that's already the case, Your Honor. Anyone who wants to view the video can go see it. The difference being that it's not a setting that's the same as any other. There's the restriction on our ability to formulate speech in the way and the manner that we choose. Can I ask a question about – let's say that we think the district court was overly broad, that there was some sort of way of narrowing what was restricted in a way that dealt with the concerns about the blind spot and the transport thing. Whose burden would it be to do that? Like does this court have to hire video producers to edit snippets out of it and to redact? How much work can we expect public officials to have to do in order to come up with an appropriately tailored product? Judge, I think that burden falls on the party moving to seal. The party moving to seal has the obligation to identify the precise spots in the records in order to meet narrow tailoring. And then I suppose – I haven't really thought about the mechanics of who is ultimately responsible for editing the video, but in the past it's been the party with the control over the video. But at a minimum, if you look at the record in this case, there isn't that level of specificity advanced by the movement at all. It was a blanket request that all of the videos be restricted, when the reality is there are probably spots that could be restricted, much like redaction in a paper or an electronic written document. But that lies with the movement. And I understood your argument to be that there was no explanation on the part of the district court as to why it wasn't more precise. Is that correct? Yes, Your Honor. The District of Connecticut appeared to be trying to fashion a blanket rule for all prison litigation. But our contention is that with sealing, every decision is document-specific. And so it may well be that there are very small portions of these videos that would pass press enterprise to sealing muster. But the district court didn't show any of that math. Now, it doesn't have to – we know from United States v. Greenwood that it doesn't have to go frame by frame and explain why it finds each frame acceptable or not. But it does have to examine each of the items over which there's been a sealing assertion. And it failed to do that. But you're not – I mean, you're not suggesting that you would accept or be content with portions of these videos, are you? Well, it depends upon the size of the redaction. No, I'm just saying you've seen the video. So are you saying that you're content with redacted versions? I didn't see that in your paper or any place. You want the whole video, and you want to post it. Your Honor, at that moment, there's no record supporting any redaction. The movement has not met its burden of redacting any of it. My point in response to Judge Perez is that –  I mean, the district court reviewed the videos. The district court articulated what the problems were with the videos because they depict blind spots within the prison's interior, aspects of prison transportation which could be dangerous and put people working in a prison at risk. So the district court made findings, and those are findings, I guess, that are subject to clear error review, right? No. Under United States v. Greenwood, we don't think the district court made sufficient findings. The district court's decision here appeared to be that because the videos were recorded within a prison, that was sufficient reason to restrict them on their face. And our position is that that's never been the law of sealing and that that won't cut it. In a different dispute, it may very well be the case that targeted redactions could meet Press Enterprise 2. It's just that that's not what the movement provided here. Well, I think part of what I think is interesting is that the district court seems to be probably, because you guys were giving them out-of-circuit cases, seem to be focusing on the ability to access and not retain and copy, right? And they're not quite the same thing, and he may have been fashioning a way for you to access them without deliberating on how you were supposed to retain and copy them. And so you then need, and if that's right, you then need to win the argument that your right of access includes the right to retain and copy, which I think you said our Second Circuit case law has already said, but Judge Costell suggested that that was an overread of what Nixon v. Warner requires. So can you help me out here? Yes. I think that Nixon v. Warner did not close the door authoritatively on the later developments that this court has created. And if you read Nixon v. Warner, I think that's because it was largely focused on the common law. The First Amendment has developed beyond that in the four decades that have spooled since, and I think that this court has been correct to conflate or to treat inspection and copying as the same thing. Has the Second Circuit ever issued a decision authorizing or requiring the release of tapes of anything, audio, visual, other, since Nixon v. Warner? Yes, Your Honor. NBC. That was 1980. That was a common law access case. That should qualify my question under the First Amendment. Thank you, Your Honor. I believe New York Times in 1987, those were wiretaps. And that was under the First Amendment? Yes, Your Honor. All right. We've gone way over, but you've reserved some time for rebuttal. Thank you. I'm not sure if I'm going to pass this one right. Finucane? Finucane? Finucane? How do you say it? Finucane, Your Honor. Finucane. Although I think I'll be Finucane or Finucane until the day I die, whether I like it or not. Finucane. All right. Mr. Finucane, the floor is yours. Thank you, Your Honor. Good morning, still morning, and may it please the Court and Brother Counsel, I'm Stephen Finucane for the appellee respectfully requesting affirmance. Simply stated, the First Amendment does not condone carnage or chaos in a maximum security prison. Can we talk about the less salacious version? Sure. Are you saying that under our circuit that we, that the First Amendment doesn't have anything to say about this case because they were allowed to view the videos? So you would say that an interpretation of our Second Circuit case law is that there's no access or there's no copyright or retain right? Yes, with a caveat, Your Honor, because respectfully there's I think several questions in there if I can. Okay, so I'm going to be more clear. Yes. Are you saying that under our Second Circuit law that the right of access does not include a right to copy or retain? In this context, yes, I am saying. Okay, in this context because it's a prison or because then now we're moving further down. So I think the answer is yes.  Yes, we have a right.  To copy and yes, we have a copy to retain and a right to retain under our understanding of First Amendment law here. The question then is are they allowed to in this circumstance? I would state it a little different if I could. Say it, please. There is no dispute from us that there is a, under this circuit's case law and under the Supreme Court's, that there's unquestionably a First Amendment right to access judicial documents. Got it. I do not concede because it's a qualified right that that necessarily includes the right to copy and certainly not in this instance. Okay, so you think that the right to copy and retain is not a different aspect of it. You think that that has to go with the tailoring. Well, I think it's a different analysis. But yes, I don't. I think that is in play in tailoring. I mean, if you look at Warner and Miralist and you read them together, an old case and a new case, one's common law, one's First Amendment, the two closest factual cases we have on point here. And they both seem to allow for in some instances copying or widespread dissemination is simply just not protected. It's a qualified right. It's not an absolute. Okay, there's another.  I'm sorry. This is really important. So I'm sorry if I'm not being as clear as I can. I'm sorry if I'm not understanding. Okay. There is a difference between the First Amendment not covering or not including the right to copying and retention and when one is looking at the appropriate limits to be placed on a document when doing the First Amendment analysis, whether or not to place a limit on copying or retention. Understood.  Are you saying that our First Amendment law in the Second Circuit does not cover copying or retention of judicial documents? Yes, Your Honor. My reading, especially given Warner, is that the right ends at the courthouse door or putting someone from the public in the same position as if they had been in the gallery through the courthouse door. I think that is sufficient. That's the scope of the First Amendment. So there's no retention right? That would be my position. And there's no, okay, there's no retention right and then therefore there is no copying right? Correct. So what do we do about the cases where we have allowed copying? Well, I don't think you need to get to that issue here because to your second question. No, you just said that our Second Amendment law doesn't cover it. I think what you're saying, and I don't want to put words in your mouth, so please push back if you need to. Sure, sure. So I think what you're saying is that the copying and the retention fall under the narrowing as opposed to the Second Amendment doesn't cover, I'm sorry, the Second Amendment. First Amendment. Stay away from the Second Amendment. I'm so sorry. We're not ready for that one. Sorry. The First Amendment doesn't cover copying and retention. The more we tease this out, Your Honor, I think the First Amendment can include copying and retention. I don't read Warner to say that, frankly. I mean, they do a First Amendment analysis in Warner and says, no, there's no right to broadcast these. You've been able to listen to them. You've been able to read the transcripts of them. You were able to listen to them in court. We made them available for you after court hours to listen to them. You're able to report on them and to answer. What do we do about the cases where we did allow people copying? I think I would reread them in light of Warner. But even if you were to disagree, Your Honor. Well, were any of those cases trial cases? As I read those cases, they were cases where there were motions or hearings or requests for hearings where it was not clear that there would be an opportunity for the public to come into a courtroom. Whereas in a trial, there is undoubtedly the right to hear the evidence presented in the open court. That sounds correct, Your Honor. That's my recollection of the cases. That's my recollection as well. And to answer Your Honor's previous question of my brother here, there was no gag order. There was no limitation whatsoever on him, the ACLU, being able to write or publish on them. And if we get to the scope of the remedy at issue here, just to be really clear, we proposed other remedies. In fact, we proposed at the hearing that if retaining was for some reason important for the ACLU, you know, Brother Counsel is a member of the bar and litigates prison cases in the district, including in front of Judge Bolden all the time, and could have simply said, yep, I'll agree to the scope of the protective order. And we would have given. I proposed that. He can have it as long as he agrees to the protective order. And he specifically said that's not good enough because he wanted any member of the public to be able to have the same access. He didn't want any sort of gatekeeping based on the request or. And because of that, Judge Bolden puts that provision at the very end that says, well, that's squarely addressed in the motion. His remedy would allow for that. And we've honored that. Other people have come and looked at the videos. We have no problem with it. We have no problem with members of the public accessing these videos. We've cleared that with the security folks at the Department of Correction. They can be viewed just like if you sat in the courtroom and watched them. And, in fact, it's more broad than if you had sat in the courtroom and watched them because two of the videos were never played and members of the courtroom never had control of the cursors or replay capabilities. So there's not only are they in the same shoes. They actually have broader. But then doesn't that speak against your security concerns? Like, if you're so concerned about blind spots and transport and everything, then why do you think any member of the public should be able to come in? Because of these specific videos, there's an assessment of especially and the most important. I mean, look, no one is disputing that one of the higher order principles is prison security or prison safety, right? You don't have to. They're not disputing it. The question is, is how are you furthering that and how are we weighing it against the First Amendment rights by something that allows anybody off the street? Like, you could have any criminal come in and look at it and watch it in the courthouse door. Like, isn't the more appropriate narrowing or the more appropriate tailoring to further your interest to look at the documents or to look at the tapes and figure out what parts you need to redact in order to make sure that blind spots and transport aren't shown? This argument is baffling to me. You're sitting here. Everybody can come in. Everybody can watch. But the reason they can't do it from the safety of their home or the comfort of their home is because of a security issue that suddenly becomes immaterial if somebody walks in. It's the posting on the internet that the deputy commissioner has these specific and heightened security concerns. But that's only because of what? Because of volume? Because of ease? Because they think that a criminal who is that concerned won't bother coming in? That doesn't change the justification, right? It's because of the ability to constantly replay and study every little aspect as opposed to coming down once or twice or three times to look at it. You want to write an article? Fine. You want to write your congressperson? Fine. But to be able to turn and exhibit, I think it's H, into the escape from Garner level of a video game, which is essentially what it would be, they walk him out. Did you specifically indicate what spot? I mean, I looked at these videos, and I would not have been able to know what constituted a blind spot, right? Like, it seems to me that someone that needed some expertise to be able to know the blind spots in order to be able to do something with it. Did you lay out and say, you know, frame from here to here says this, frame from here to here is transport, frame from here to here is? Transport we definitely laid out. That's the deputy commissioner's biggest concern is the walk out of the prison unplanned medical trip. It's one of his biggest security concerns dating back decades, because it's unplanned and it's to an outside facility. For the surveillance videos, the blind spots, we're in a little bit of a scala encryptus with that, Your Honor, because the more we point it out, the more everyone's aware of it. But we did articulate that there are blind spots, areas that are not shown. And some of the evidence at trial touched upon this a little bit, too, where you actually had to compare different videos and timestamps to figure out what was shown. But Mulligan's declaration was sweeping. He had like an hour of tape where he said you're showing blind spots. For blind spots, yes. There was a little bit more sweeping in the citations. His citation on the escort out, though, is quite a lot more tailored. And what do you do with the staleness of this? So this incident took place in 2019. And the issue was litigated before the court. And I think the court rendered its decision, was it in March of 2024? Twenty-five. Something like 2025. So it was six years after this was shown. And your client, Byers, said they moved the camera placement and the camera angles around repeatedly. Why wasn't the information totally stale as the camera location? I don't think the camera above the officer's bubble has moved. But I would have to double-check that, Your Honor. But certainly the escort out of the prison is not stale. Well, how about the two or whatever it was, the one hour of the guy mopping the floor. And that was the justification was that showed camera placement. Now, that's not over the guard station. That's in the general population area. And Mulligan said, hey, that shows camera placement and should not be disclosed. And apparently, if I'm right, the judge bought that. Well, it shows camera placement, but it also shows what is and is not visible and areas that are not visible. But it's more than just blind spots. So if you look at it holistically, there's also law enforcement techniques, how they're unlocking and locking doors, how they're going about their tours. I mean, it's a holistic view. I will be entirely candid with you, Your Honor. The biggest safety concern is the handheld videos, escorts in and out. Those are a heightened level of concern over the stationary cameras. You purported to state your grounds prior to the judge ruling on Christmas Eve, right? And he said you were not specific. You didn't offer specificity and he gave you until January 10th. That's true. And you didn't do it by January 10th. And then he got to the hearing on January 13th and said, pretty please, could you get an affidavit or something to support with specificity your claims? And it was the Mulligan Declaration, if I'm correct, was not filed until after the hearing before the judge. I don't. I almost agree. I disagree on one critical step in that timeline respectfully, Your Honor, which is we absolutely did provide specificity in our second brief after the Christmas holiday. In fact, we point out a lot of the same. Oh, in the brief. In the brief. But there was no one who tied it into the video. It was simply counsel's statement in an unsworn brief. Well, as an officer of the court, and I dropped the footnote that says I've conferred with the deputy commissioner on these, I'm happy to memorialize it in a declaration, which I then did. I mean, those were representations. Well, that was only after the judge wanted you or invited you to do it. Yeah, I offered to, Your Honor. I offered to do that. In that brief, I said if you want this sworn, I will get it for you sworn. It's readily conferrable. I had already cleared it with the deputy commissioner. So it was on the judge's back. It was not on the judge's back. I mean, ultimately, the judge has the supervisory power and authority over its files and dockets. And this is the other thing that's a problem with the waiver argument here is it kind of presupposes that this is exclusively and entirely Mr. Byers' right or interest to waive at his pleasure. He's already conceded that there's not a waiver, that what it is more actually is a looking at it as a presumed inventory. But this impacts a lot of people. Can you talk to me, though? I'm having a very hard time putting the limits around your prison safety issue. Like, how would not any video taken in prison under what you are alleging to us with the blind spots, the transport, the law enforcement techniques, what would be allowed? So to answer your honest question, this is one area where I think Brother Counsel and I actually agree, which is it is a document, case-by-case specific analysis, and an example might be one of his examples. In his brief, you have a video of an inmate sitting in his cell reading a book. Absent more, I can't think of a reason, and I wouldn't ask the deputy commissioner to give me an affidavit saying that that is a security issue unless I'm missing something. That is somebody sitting in a cell reading a book. So you at least agree that there are some limits. Absolutely. Even when the value that you're trying to promote is prison safety. Correct.  All right. Well, we've gone over, but we will now hear Mr. Barrett for three minutes of rebuttal. Thank you all for your time, Your Honors. Thank you. If I could pick up Judge Perez's question about third parties, which you've asked in a couple of forms to both of us. I agree that there are circumstances under which a stranger to the litigation could show up and assert a press enterprise to sufficient interest. It's just that that's not this case. We're not looking for a blanket ruling applicable to all prison videos or, indeed, to any trial exhibits. What we're looking at here is the sequence of events that unfurled and the exact documents that were at issue. Here, Byers is a DOC employee, and the DOC went as far as to include in Mr. Mulligan's declaration that DOC knew the videos were used for his defense, and they furnished them for that purpose. So that concern, I think, is off the table. The early court closure cases, I think, speak quite well to a picture being worth a thousand words. I'm thinking in particular of Oklahoma Publishing Co., from which you get the court closure cases and from which you get the sealing cases. They're all of a piece. That was a case in which people in the courtroom were allowed to see and photograph events happening in the courtroom, but the clerk's office later issued a prohibition against downstream use of those things. The Supreme Court said there that the difficulty in applying that analysis is that if you were there and you saw it, in effect, that's the ballgame. You have to have a very good reason to prohibit people from later use of a judicial document. I think that this court's post – this court's New York Times move took common law and First Amendment access rights into the same vein, and it also applies the similar predicate to both. Well, let me ask you. Take Mirlis v. Greer. If the party seeking access had simply said First Amendment in addition to their common law privilege claim, how would the case have been decided differently? What would have been different? I don't know that it would have, Your Honor. The difference here, the salient difference, being the material at issue. In Mirlis, it was a videotaped deposition of a witness who was forced to recount his own childhood sexual assault. In this case, it's some surveillance videos that look quite a bit like a very severe boxed door, and most of the video is something that can be viewed by anyone who is or has ever been incarcerated at Garner by looking out their cell door. There's a qualitative difference there. Well, it would have to be tailored. It would have to promote a higher value. I don't know what the higher value would be. Privacy is not, has already been held not to be a sufficient higher value. You're talking about the Mirlis video? Yeah. I think there is something to this court's concern in Mirlis about the videotaped deposition of that nature having the ability to re-inflict trauma. We know that that's what the court decided in that case as to the common law privilege. I'm asking you, and maybe it's an unfair question, how would the case have gone differently if you applied the First Amendment framework? Because it seems to me that there would be a virtually absolute right to the access to those tapes that were played in court of the deposition. I'm not so sure about that, Your Honor. And were not sealed. Yes. I'm not sure that the First Amendment compels as a blanket rule any particular outcome to a category of documents. I think that the videotaped deposition in Mirlis might have been the sort of thing that rises to the compelling interest, and the substitute that the district court had in that case in the form of the complete transcript being available may meet narrow tailoring. But wouldn't your position be no one's moved to seal it? It's not sealed. Case over. No, Your Honor. I think the other salient difference is that Mr. Hack, the deposition witness, was not a party in Mirlis. In fact, his videotaped deposition was shown because he had fled service, probably for understandable reasons. He had fled service of a subpoena to testify in the flesh. I think it's understandable for the Court to take up his concern when he resurfaced, giving the incredibly sensitive nature of that video. I think it's also worth noting that in Mirlis, because it was brought in for purposes of covering for an unavailable witness, the deposition had been video recorded and, of course, it had been transcribed. The District of Connecticut allowed public access to the transcription. Here, these videos either did not have a soundtrack, some of them on my review appeared not to, or the sounds weren't played in court. There is no transcript. The picture here is the only picture that's available. But the sound, was any of the sound of any evidentiary significance? Given that I didn't hear any sounds in my review, Your Honor, I think the answer is no. But if we're looking for a substitute such as was available in Mirlis, there just is none here. You have to see the video. All right. Well, we certainly got our money's worth. It's an interesting case. We will reserve decision. Thank you both.